UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

STEPHEN A. MAYBANK,           )
                                     )
       Plaintiff,              )
                                     )
VS.                               )     Civil Action No:  SA-11-CA-508-XR
                                   )
JOHN M. McHUGH, SECRETARY,   )
DEPARTMENT OF THE ARMY,      )
                                   )
       Defendant.         )

**ORDER**

On this date, the Court considered Defendant's Motion for Summary Judgment (docket no. 41) and the Response and Reply thereto.  After careful consideration, the Court grants the motion.

**I. Factual and Procedural Background**

Plaintiff Stephen Maybank was employed as a Traffic Management Specialist by the U.S. Army at Fort Sam Houston from August 2003 to February 2008.  Before beginning civilian employment at Fort Sam Houston in August 2003, Plaintiff held a similar position as active duty military at Fort Gordon, Georgia, until his military retirement on May 31, 2003.  Plaintiff was hired to work in the Logistics Readiness Division, Transportation Branch, of the G-4 Directorate of the U.S. Army South Organization (USARSO) at Fort Sam Houston, San Antonio.

At the time Plaintiff accepted the position, the USARSO command was in the process of moving from Puerto Rico to Fort Sam Houston.  The Army entered into a transportation agreement to relocate Plaintiff from Fort Gordon to Fort Sam Houston, and this agreement provided Plaintiff with the benefit of relocation expenses.  Plaintiff has admitted that the transportation agreement was

entered in error based on the fact that USARSO was relocating from overseas.  Pl. Ex. 1 at 9; Docket no. 42-2 at 205.  New hires that relocate from a domestic location ordinarily are not paid such relocation expenses.

When Plaintiff first relocated to San Antonio, his wife and children did not accompany him, and thus it was only a partial move.  In 2003, Plaintiff submitted a voucher for Permanent Change of Station ("PCS").  He was reimbursed approximately $9,500 in relocation expenses pursuant to the transportation agreement.  After his family moved to San Antonio in 2006, Plaintiff submitted a final PCS voucher to indicate his family had relocated, with applicable receipts for moving his household goods.  Because his family relocated more than 24 months after Plaintiff, he had to obtain approval for the time limit extension, which was granted.[1]  He also requested a commuted rate or "self-move" because his wife had accepted a job at USAA and needed to move immediately.  His original estimate for the move cost was about $6,000, but the total cost turned out to be approximately $18,000 because the goods weighed more than he originally estimated. Docket no. 42-2 at 202.

It is undisputed that there were a number of amendments to the original PCS travel order, but Plaintiff notes that many of the amendments were not made or caused by him.  Rather, he states that Defense Finance Accounting Services ("DFAS") found the original PCS travel orders were not properly completed and directed the DCS-G4 Personnel Officer, Ms. Lydia Kieswhetter-Wright to amend the order.  Plaintiff asserts that she attempted to correct the record, which resulted in several amended travel orders.

The DFAS notified Plaintiff on February 23, 2007, that he was not entitled to the $9,500

---

[1] A civilian employee has two years from the date of the PCS move to file the claim forms.

reimbursement and had incurred a debt that would be offset from his regular pay.  Docket no. 42-3.

Plaintiff was also notified of his right to request a waiver of repayment of the debt.  *Id.*  On February

27, 2007, Plaintiff submitted a waiver of indebtedness application packet to the Commanding

General via his second-level supervisor at the time, Lt. Col. Kyle Waggoner.[2]  The packet included

a cover memo and all the travel orders, amendments to the travel orders, and email exchanges

between Plaintiff and DFAS regarding how to apply for the waiver.  Pl. Ex. 1 at 14.

The details of what happened after that are somewhat disputed and unclear.  Waggoner stated

he was suspicious of the packet because it contained so many amendments and discrepancies.[3]  At

some point, Plaintiff's third-level supervisor, Mr. James Norris,[4] received the waiver packet as it

passed through for approval.  He noticed that the packet was missing a copy of the original travel

voucher, and informed Plaintiff that he could not send the packet forward without a copy of the

voucher.  Plaintiff states that he then contacted the DFAS supervisor for a copy of the original

voucher and presented it as requested.  When Plaintiff provided the voucher on March 7, Norris

could not identify the signature as any authorized supervisor in the G-4 command, and the signature

was illegible.  Docket no. 42-7.  Norris states that he asked Plaintiff who had signed the voucher, and

---

[2] Waggoner became Plaintiff's second-level supervisor in 2006 and remained his second-level supervisor until February 2008.  Docket no. 42-4 at 3.

[3] See Fact-finding hearing testimony at 119-127.  The Court notes that the transcripts submitted as summary judgment evidence are not complete, and as a result often do not identify the various speakers.  The Court has attempted to determine who the various speakers are as best it could.

[4] Norris was Plaintiff's third-level supervisor from 2003 until February 2008.  Docket no. 42-4 at 3.

Plaintiff stated that he did not know.[5]  Plaintiff denies that Norris asked him this, and states Norris asked him only if he had a copy of the original voucher, to which Plaintiff replied that he was not sure.

Norris stated he became suspicious because Plaintiff had not submitted the original voucher and because the signature was illegible and Norris could not identify it as an authorized signature.[6] Norris suspected the signature might be forged.  Norris also stated that he became suspicious of the self-move that he had approved, and that Maybank had taken advantage of the self move.[7]  Norris testified decided to go to JAG because he did not want to send in a packet where he had doubt about its authenticity, and he wanted guidance from JAG.  Docket no. 42-2 at 224-25.

The details of how Norris and Waggoner approached JAG are unclear and/or disputed, as are the details of how it was determined that they should go to law enforcement.  Plaintiff complains that no one ever approached him with concerns about the voucher before going to law enforcement. Plaintiff also complains that Norris and Waggoner's explanations for why they were suspicious are not credible, and they could have easily resolved their suspicions about the signature and voucher

---

[5] Plaintiff asserts that the identity of the signor did not matter to him, because the travel had already been authorized and the signature merely attested that the papers were in order.  Pl. Ex. 1 at 11.

[6] Norris did not investigate to determine who the signature belonged to, nor did he talk to Plaintiff again about the packet before speaking to JAG.  Docket no. 42-2 at 223.  Although Plaintiff makes much of the fact that he was not asked who signed the voucher, the fact remains that, if he had been asked, Plaintiff would not have known the identity of the signer, and thus this likely would not have alleviated any suspicion.

[7] Docket no. 42-8 (Norris sworn statement).  Norris testified at the EEOC hearing that he was not concerned about the number of amendments to the packet because they had been explained to him and he was aware of the circumstances surrounding them.  Docket no. 42-2 at 226-27.

by talking to Plaintiff.[8]

Defendant states that Waggoner then contacted the military police, but they directed him to the Criminal Investigation Division (CID). Plaintiff states that Waggoner identified Charles Koutras as the person who advised he go to CID, but Koutras testified that he gave no advice whatsoever. Plaintiff argues that Defendant's explanations of how they decided to contact CID are conflicting and not credible. Waggoner contacted the CID on or about April 12, 2007 to request an investigation and provided a sworn statement detailing his suspicions, as did Norris. The investigation was conducted by Agent Branlund. She questioned Norris on April 12, 2007 about his suspicions. She also asked him if there were any other "questionable" vouchers submitted by Plaintiff. Norris stated that Plaintiff went TDY (temporary duty) to a GSA conference and had a rental car, the receipt for which reflected excessive mileage, and the hotel ticket for parking only reflected two days rather than the entire duration. Norris stated that Plaintiff never admitted it, but he suspected that Plaintiff stayed with a friend and not at the hotel. Apparently Waggoner also expressed suspicion about some of Plaintiff's other travel.

CID completed its investigation in about a week, and closed the case on April 18, 2007 after finding no basis to find any criminal misconduct. Branlund testified that she telephoned Waggoner about the results, and that he expressed some concerns about the fact that CID had not verified the mystery signature. At some point, JAG Agent Woods also expressed disagreement with the conduct of the investigation and its thoroughness to CID.

Defendant asserts that Plaintiff's supervisors did not inform him that he had been referred

---

[8] The signature was ultimately determined to be legitimate. Plaintiff's waiver request was ultimately approved by the Commanding General on June 11, 2007, and the recommendation was accepted by DFAS such that Plaintiff was not required to repay the relocation reimbursement.

for criminal investigation upon advice from CID, nor did they then inform him that he had been cleared of any wrongdoing because he had not been told of the investigation in the first place. Plaintiff states that Agent Branlund testified that she did not advise Plaintiff's supervisor not to discuss the case with the Plaintiff or to inform him that he was being investigated, but only referenced not discussing a new incident (the allegation of an additional fraudulent TDY voucher).

After a time, Plaintiff began to question why he had not heard about his waiver request and attempted to locate it. He then concluded that his waiver request was being delayed or intentionally lost (by Norris and Waggoner) because of his race. Docket no. 42-4 at 3; Pl. Ex. 1 at 16. Plaintiff first contacted the EEO office on or about April 18, 2007 to inquire about procedures, then contacted an EEO counselor on April 20, 2007.[9] The EEO counselor reported to Plaintiff sometime in June that his waiver packet was not lost but had been referred to CID for investigation. Pl. Ex. 1 at 16. Thus, Plaintiff learned on June 15 about the investigation. Plaintiff filed his Formal Complaint of Discrimination on June 25, 2007.

Plaintiff's EEO complaint alleged that Plaintiff was discriminated against on the basis of his race (Black), and retaliated against for his prior EEO activity (April 20, 2007). In support of the racial discrimination complaint, Plaintiff wrote: "On March 29, 2007, I became aware that Mr. Norris lost my packet, for 'Waiver for Repayment of Debt,' which I submitted on 27 Feb 2007. I perceive that Mr. Norris' action is discriminatory, and maybe a willful intent to discriminate based on my Race. Further, his action created a hostile work environment, which has festered into distrust and anxiety."

In support of the reprisal/retaliation (April 20, 2007) claim, Plaintiff wrote: "On 15 Jun 2007,

---

[9] Plaintiff amended the Complaint on February 13, 2008.

I discovered the USARSO Command (Mr. James Norris and COL Dan Meyer), withheld favorable results of the outcome of a criminal investigation and continued to pursuit of an investigation after I was cleared of all wrong-doings by Criminal Investigations Division (CID).  I believe such reprisal action resulted in: a) The continual action (withholding information) to create the appearance of improprieties and illegal actions when the investigation was concluded; b) The continuation of actions (affidavits were still being submitted to CID) to incriminate me after the investigation was concluded; c) Actions to remove me from favorable consideration for a 'Supervisory' position, as indicated in personnel structure by paragraph and line number, dated Apr 2007 to a 'Non-Supervisory' position as indicated in the change to the 6th Army personnel structure, dated 7 May 2007."[10]

In support of the reprisal/retaliation since March 2005 claim, which is really a discrimination claim, Plaintiff wrote: "I perceive that the bias and animosity against me was based on a previous disagreement with Mr. Norris concerning the execution of a contract resulting in me being: a) Removed as the Contracting Officer Representative (COR); b) Denied (4) Training: - Logistics Execution Development Course, - Transportation and Logistics Mgmt, - Sustainment Base Leadership & Mgmt, and - Transportation Coordinator Trng; c) Denied Travel as it relates to specific duties and responsibilities for job assignments (could not perform my job, because I was not allowed to travel, but the Contractor (Mr. Jose Hernandez and Ms. Muriel Jacque-Saintiny), were used to perform my duties."  Plaintiff later clarified that this claim was not a retaliation claim based on protected EEO activity, but part of his race discrimination claim.

The Army investigated between August 22, 2007 and May 12, 2008, creating a Report of

---

[10] This last allegation was voluntarily withdrawn.  Docket no. 42-1 (EEOC Decision) at 3 n.1.

Investigation (ROI), including a transcript of sworn testimony taken at a Fact-Finding Conference on August 29, 2007.  Plaintiff elected to proceed to an evidentiary hearing conducted by an EEOC Administrative Judge.  The evidentiary hearing was conducted May 6-8, 2009, and Administrative Judge Robert Powell then issued a Bench Decision in the Army's favor on May 8, 2009.  The Army's office of Equal Employment Opportunity Compliance and Complaints Review issued a Final Agency Action adopting the decision on June 10, 2009.  Plaintiff appealed to the EEOC's Office of Federal Operations, which issued its Decision affirming the final agency action on November 9, 2010.  Docket no. 42-1.

Plaintiff filed his original complaint on December 21, 2010 in the District of Columbia District Court, asserting claims under Title VII.  Federal employees asserting discrimination claims under Title VII are entitled to *de novo* review, but the administrative findings may be entered into evidence and considered by the district court.  *Astoria Fed. Sav. & Loan Assn' v. Solimino*, 501 U.S. 104, 113-14 (1991) (citing *Chandler v. Roudebush*, 425 U.S. 840 (1976)).  Following a joint motion of the parties to transfer venue, the case was transferred to this Court.

Plaintiff was later granted leave to file an amended complaint, and the First Amended Complaint (docket no. 23) is the live pleading.  Therein, Plaintiff alleges the following claims: (1) Defendant wrongfully referred Plaintiff to CID, without affording him the opportunity to address the stated concern or to clarify the matter, while other similar employees were not referred to CID; Plaintiff asserts that he was targeted because of his race; (2) Defendant illegally retaliated against Plaintiff for filing an EEO complaint and discriminated against him based on his race by keeping the criminal investigation and its result secret from him, and by actions taken to press CID to continue a closed investigation after CID found no basis for continuing the investigation; Plaintiff contends

that Defendant kept the knowledge of the criminal investigation from Plaintiff and secretly maintained the appearance of wrongdoing in an effort to harm and blemish Plaintiff's service record; and (3) Defendant discriminated against Plaintiff on the basis of his race by denying him travel to overseas duties, wrongfully removing him from duties as a COR, and denying training opportunities.

After discovery, Defendant filed its Motion for Summary Judgment. Defendant argues that summary judgment is appropriate because (1) Plaintiff cannot establish a prima facie case of race discrimination insofar as he cannot point to any nearly identically situated employees who received preferential treatment; (2) he otherwise has no probative evidence that Defendant was motivated by discriminatory and retaliatory animus; (3) he did not sustain a materially adverse employment action; (4) the Army acted for legitimate, non-discriminatory reasons; and (5) Plaintiff's claims regarding denial of training, removal from the COR position, and most of his claims regarding denial of travel are untimely.

## II. Summary Judgment Standard

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the nonmoving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City*

9

*of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

## III. Analysis

### A. Race Discrimination Claim Related to the Referral to CID for Investigation

Plaintiff alleges the following: The Defendant wrongfully referred him to CID without affording him the opportunity to address the stated concern or to clarify the matter. The Defendant's action in the CID referral was inconsistent with the manner in which others in the organization, with similar Defense Travel System (DTS) errors, were addressed. Although there were many other personnel in the organization, who were identically situated, only Mr. Maybank was referred to criminal authority. Yet, a Command Audit Report clearly showed that Mr. Maybank's travel error resulted from the implementation of the new DTS, which was extremely user "unfriendly," and that ineffective management control contributed to the DTS overpayment errors. Since the persons who referred Mr. Maybank to CID were aware of this, they made statements under oath that they knew to be false at the time of the referral.

Defendant argues that Waggoner and Norris had legitimate reasons to be concerned about the propriety of Plaintiff's waiver request and appropriately sought legal advice to address these concerns before forwarding the waiver application to the Commanding General. Defendant notes that the investigation was closed on April 18, 2007 and was not re-opened, that Plaintiff was not charged with a crime, that Plaintiff was not "titled" by CID,[11] and that his name is not retrievable on any national criminal record database by any potential employer as a result of the CID referral.[12]

---

[11] Titling is the process by which the CID makes an administrative determination about whether the individual and the possible crime for which he was investigated will be indexed with the national Crime Records Center.

[12] This is confirmed in the summary-judgment evidence submitted.

Defendant notes that Plaintiff was not disciplined as a result of the waiver request, and the request was ultimately approved. Defendant contends that Plaintiff cannot establish that any other nearly identically situated employee made a similar waiver request for repayment of a debt and was treated more favorably. Accordingly, Defendant moves for summary judgment on Plaintiff's claims related to the CID investigation because Plaintiff was not materially harmed and because Plaintiff has failed to demonstrate disparate treatment.

In order to establish a prima facie case of discrimination in a disparate treatment case, a plaintiff must show that she was: "(1) a member of a protected class; (2) qualified for the position; (3) subject to an adverse employment action; and (4) treated differently from others similarly situated." *Abarca v. Met. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (citations omitted).

### 1. No adverse employment action

Defendant asserts that the referral to CID resulted in no harm to Plaintiff, as he lost neither pay nor status. Although Plaintiff testified at the fact-finding conference that withholding the favorable result of the investigation maintained the appearance of wrongdoing, Defendant notes that the favorable results were reported to Plaintiff's supervisors. Further, Defendant notes that Plaintiff learned of the investigation results approximately two months later, and has not shown how he was harmed by the delayed notification. Though the Army attempted to persuade CID to continue or re-open the investigation, these attempts were unsuccessful. Thus, Defendant contends, threatened actions or possible outcomes (such as titling) are not materially adverse if they do not come to be, and the initiation of internal investigations that do not lead to any administrative action against the employee are not materially adverse employment actions.

Proof of an adverse employment action is a necessarily element of a prima facie case of race

discrimination.  With respect to claims of discrimination, in accordance with Title VII's language, the Fifth Circuit generally only recognizes ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating as actionable adverse employment actions.  *See Harrison v. Corrections Corp. of Am.*, 2012 WL 1623575 (May 9, 2012).

The Court agrees that Plaintiff fails to demonstrate an adverse employment action based on the referral to CID for investigation.  The Fifth Circuit has held that an investigation into an alleged improper use of a government vehicle was not an adverse employment action, where pay, benefits, and level of responsibility remain the same.  *Mora v. Ashcroft*, 142 Fed. Appx. 206 (5th Cir. 2005). The Court has also generally stated that allegedly baseless investigations or false accusations do not qualify as ultimate employment actions.  *Cardenas-Garcia v. Tex. Tech. Univ.*, 118 Fed. Appx. 793, at *1 (5th Cir. 2004); *Hockman v. Westward Comm., LLC*, 407 F.3d 317, 331 (5th Cir. 2004) (claim that employer instituted a baseless racial harassment investigation did not qualify as adverse employment action); *Breaux v. City of Garland*, 205 F.3d 150, 157-58 (5th Cir. 2000) (false accusations and investigations are not adverse employment actions); *Benningfield v. City of Houston*, 157 F.3d 369 (5th Cir. 1998) (internal affairs investigation not an adverse employment action).

Other circuit and district courts have reached similar conclusions.  *Johnston v. O'Neill*, 130 Fed. Appx. 1 (6th Cir. 2005) (finding that investigation did not amount to adverse employment action were all charges were dropped and plaintiff was not otherwise punished); *Watkins v. Tex. Dept. Crim. Justice*, Civ. A. No. H-03-5698, 2006 WL 1581833 (S.D. Tex. June 6, 2006) ("To the extent that Plaintiff asserts that TDCJ discriminated against him by investigating the alleged assault that occurred during the Prison incident, this claim fails because an investigation of this type is not an adverse employment action."); *Dawson v. Rumsfeld*, Civ. A. No. 1:05-CV-1270, 2006 WL

12

325867 (E.D. Va. Feb. 8, 2006) ("It is evident that the mere decision to initiate an investigation is not an adverse employment action."); *Lewis v. Conn. Dep't of Corrections*, 355 F. Supp. 2d 607, 619 (D. Conn. 2005) ("Nor could Officer Lewis' counsel cite a single case that held that the mere participation in an internal investigation-standing alone-was an adverse employment action. Indeed, case law on this subject holds precisely the opposite.").

Although Plaintiff attempts to raise a fact issue concerning whether the referral to CID was legitimate, he does not produce any evidence demonstrating that the referral affected his the conditions of his employment in any way. Although he argues that the intent was to "title" him, that did not occur. Although he contends that certain individuals took actions to press CID to reopen the investigation, that also did not occur.[13]  Plaintiff's testimony during the various investigations and hearings demonstrates that he suffered no ultimate employment action. Insofar as Plaintiff alleges that they withheld the outcome to maintain the appearance of wrongdoing, again Plaintiff shows no adverse employment action that resulted.

### 2. No disparate treatment under nearly identical circumstances

Plaintiff attempts to establish a prima facie case by showing that other employees with DTS errors were treated more favorably. To do so, Plaintiff must show that employees who were not members of the plaintiff's protected class were treated differently under circumstances "nearly identical" to his.  *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991). The employment actions being compared will be deemed to have been taken under nearly identical circumstances

---

[13] Plaintiff asserts in his brief that "[t]he impact of Defendant's actions is still problematic to Plaintiff's current security clearance investigation; Plaintiff must reference the CID investigation in all current and future security clearance reviews, which continues to be a source of emotional duress for Plaintiff."  Response at 34.  However, Plaintiff presents no evidence in support of this assertion, and statements in a brief are not evidence.

when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Thus, "employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated." *Id.*

Defendant argues that Plaintiff cannot show that any nearly identically situated employees were treated more favorably. Plaintiff acknowledged at the fact finding hearing that he is unaware of anyone else that submitted a waiver request regarding repayment of a debt. Docket no. 42-5 at 59. Plaintiff was not referred simply for DTS travel errors, but for supposed irregularities and suspicious circumstances surrounding his waiver request. Although the referral may have encompassed additional concerns over other travel issues, these are not nearly identical circumstances because the violation histories are not similar.[14] Further, although Plaintiff contends that other similarly situated employees had DTS overpayment errors were not referred to criminal investigation, Plaintiff does not come forth with evidence to identify these individuals or show that they were similarly situated in terms of their job positions, supervisors, types of errors, etc. Contrary to Plaintiff's assertion, the fact that other individuals had overpayment errors and were not referred for investigation is insufficient to show that these individuals were treated more favorably under nearly identical circumstances.

3. Pretext

Most of Plaintiff's briefing attempts to establish that Defendant's asserted reasons for

---

[14] In addition, it appears from the record that Plaintiff had one of the highest number of travel-related errors. Docket no. 42-2 at 192-93.

referring Plaintiff to CID or attempting to continue or reopen the investigation were pretextual. Plaintiff points to a number of inconsistencies in the evidence concerning what exactly Norris and Waggoner were suspicious about, when and how they contacted JAG and CID,[15] what they told to JAG and CID concerning their concerns and investigation, what they were told about keeping information confidential, and when they learned of the investigation results. Plaintiff contends that Norris and Waggoner went to CID under false pretenses and with false information, and that their credibility is easily challenged by their inconsistent statements. However, the Court need not reach the issue of pretext or credibility because Plaintiff has failed to establish a prima facie case, as discussed above. The failure to establish a prima facie case requires the Court to grant defendant's motion for summary judgment on this employment discrimination claim. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012) ("To survive summary judgment on a claim of employment discrimination based on circumstantial evidence, the plaintiff first must establish a prima facie case.").

## B. Retaliation Claim

Plaintiff alleges Defendant illegally retaliated against him for filing an EEO complaint in April 2007 by keeping the criminal investigation and its result secret from him, and by actions taken to press CID to continue a closed investigation after CID found no basis for continuing the investigation. Plaintiff contends that Defendant kept the knowledge of the criminal investigation from him and secretly maintained the appearance of wrongdoing in an effort to harm and blemish Plaintiff's service record.

---

[15] Plaintiff devotes much of his reply brief to pointing out alleged inaccuracies in Brandlund's investigative summary, concluding that Waggoner incorrectly presented his allegations and misled her as to certain facts and what was being investigated.

Title VII forbids retaliating against an employee because that individual "made a charge" under Title VII. 42 U.S.C. § 2000e–3(a).  As with a discrimination claim, a retaliation claim based on circumstantial evidence proceeds via the *McDonnell Douglas* burden-shifting framework. *E.g.*, *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).  To present a prima facie case of retaliation, a plaintiff must show: (1) he participated in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Id.* at 557.  An adverse employment action in the context of a retaliation claim is one that "a reasonable employee would have found ... [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).

Once the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* at 557. If the employer meets this burden of production, then the burden shifts back to the plaintiff to show that the employer's proffered explanation is a pretext for retaliation or that the employer's explanation, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's race.  At this stage, "a plaintiff must show that the adverse employment action would not have occurred 'but for' the protected activity in order to prove unlawful retaliation." *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996) (citation omitted); *Nunley v. City of Waco*, 440 Fed. Appx. 275, *5 (5th Cir. 2011) ("[O]ur decision in *Xerox* did not dispense with this final 'but for' requirement for avoiding summary judgment.").

To defeat a motion for summary judgment, a plaintiff must demonstrate "a conflict in substantial evidence on [the] ultimate issue" of "but for" causation. *Hernandez v. Yellow Transp.*,

*Inc.*, 670 F.3d 644, 658 (5th Cir. 2012).  "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* (quotation marks and citation omitted). Temporal proximity, standing alone, is not enough.  *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

Plaintiff first contacted his EEO representative on April 18, 2007.  Thus, only actions taken after that date could conceivably be taken in retaliation for this protected conduct.  *See Watkins v. Tex. Dept. of Crim. Justice*, 269 Fed. Appx. 457, 461 (5th Cir. 2008) (actions that predate protected activity cannot be retaliatory).  Plaintiff was referred to CID on April 12, and CID closed the investigation on April 18, 2007.  Thus, the original referral to CID cannot be retaliatory because it occurred before Plaintiff's protected activity.

However, Plaintiff complains that the investigation and its results were kept secret, and CID was pressed to continue or re-open the investigation in retaliation for his EEO activity.  Plaintiff submits an email from a Teri Garnett to Col. Meyer dated April 21 showing that Plaintiff contacted an EEO Counselor.  Meyer then forwarded it to Norris, Col. Woods, and others in an email dated April 22.  The email informed Norris that Plaintiff filed an EEO Complaint against him related to the delay in processing his waiver packet.  Norris forwarded the email to Waggoner on April 23.[16]

Plaintiff argues that the results of the CID investigation were kept secret to maintain the appearance of wrongdoing.  At the EEOC hearing, Plaintiff was asked who specifically discriminated against him, and he listed Norris, Waggoner, and Col. Meyer (the Chief of Staff at the time). Docket no. 42-2 at 193.  Plaintiff testified that Meyer knew the packet was returned from CID on April 20,

---

[16] The email chain refers to a prior meeting among the parties, which Plaintiff asserts was a meeting to discuss Plaintiff's EEO Complaint.  However, there is no evidence in the record to support this assertion, and the meeting could just have easily been about the investigation.

but he kept it under wraps to "continue the pursuit of the investigation." Docket no. 42-2 at 195. However, as Defendant points out, Plaintiff's supervisors were told of the favorable result of the investigation.[17] Thus, it is unclear how Plaintiff was actually harmed by the fact that the results of the investigation were kept secret, or who they were kept secret from other than Plaintiff. Although Plaintiff contends that it created an environment of distrust and stress, presumably the same result would have obtained had he been told he had been referred to CID for investigation. And Plaintiff fails to demonstrate any harm stemming from the failure to inform him of the investigation between its initiation and his discovery in June 2007.

Plaintiff alleges that Defendant "illegally reprised against Plaintiff" by taking actions to press CID to reopen the closed investigation. Defendant argues that this "reprisal" includes a telephone call from Lt. Col. Woods (the SJA senior legal counsel) to the CID Special Agent in Charge, Russell Graves, which was unsuccessful in causing CID to reopen the investigation. Defendant contends that no further action was taken on the matter, and Plaintiff's waiver request was ultimately approved.

The evidence shows that CID conducted its investigation quickly, and did not attempt to determine who signed the original voucher. Russell Graves, the Special Agent in Charge for the CID unit, testified that he received a request to examine the travel voucher for possible fraud, that they reviewed the documents and interviewed several people (including finance and "several other

---

[17] At the fact-finding hearing, Plaintiff testified that "[t]he withholding of favorable information created and maintained the appearance of wrongdoing in the eyes of my superior Lieutenant Colonel Waggoner and did therefore constitute an act of reprisal." Docket no. 42-5 at 20. Plaintiff testified that Waggoner believed the packet was still with CID on May 24, 2007. *Id.* at 48. However, in his brief on appeal of the AJ's decision, Plaintiff states that Waggoner knew the results of the investigation shortly after it was concluded because Agent Brandlund testified that she personally telephoned him and gave him the results of the investigation within a day or two of the outcome. Pl. Ex. 1 at 33. Plaintiff also attaches testimony from Agent Branlund that she informed Waggoner of the results of the investigation soon after it was closed. Pl. Ex. 3 at 22.

individuals") and determined there was no fraud based on the evidence, the regulation, and the vouchers. Docket no. 42-5 at 227. He stated that CID did not investigate the signature because "the signature really is not an issue" because "all the paperwork was genuine." *Id.* Graves testified that CID just looked to see if all the paperwork was there and looked at the circumstances of why it was filed.

Graves stated he sent the report to JAG at USARSO when it was closed. *Id.* at 228. He stated he had discussions with SJA (Col. Woods) that "they didn't like my findings." *Id.* at 229. Norris also testified that Woods thought they should have done more, and that even after CID closed the investigation, Plaintiff's supervisors did not know the identity of the "mystery signature." *Id.* 270. Both Norris and Waggoner testified that they did not pursue an additional internal inquiry because CID had decided not to pursue it and Waggoner felt an additional inquiry would be fruitless. *Id.* at 270, 419. Branlund testified that she spoke to Waggoner about the results of the investigation, and he expressed disagreement. She also stated that Col. Woods expressed disagreement and inquired about why they did not investigate the signature. *Id.* at 628-29. It is not clear from the evidence presented when Woods contacted Branlund or Graves with his disagreement, though it appears to have been within a week or two after the final report was returned to USARSO SJA. *See* Docket no. 42-4 at 15.[18]

---

[18] The Court points out, as Defendant has done, that Plaintiff refers to evidence that he has not actually submitted to the Court. For example, he refers to testimony at hearings that is not included (Defendant has submitted portions, but not all, of certain transcripts). He also refers to deposition testimony that has not been submitted. In docket no. 47, Plaintiff describes 17 exhibits, but attached only 9 with his response, and 1 additional exhibit with his sur-reply. The Court cannot consider evidence that has not been submitted. In addition, the brief filed by Plaintiff's attorney during the prior proceedings (Pl. Ex. 1) is not competent summary judgment evidence. The Court has cited it in some instances for background facts, but it is not evidence for purposes of summary judgment. Plaintiff was informed by the Defendant of the need to submit his evidence at the

Plaintiff alleges that Woods was "expressing more than his disagreement with the CID experts; he was engaging in possibly illegal activity and was being used as a conduit for retaliatory action against Mr. Maybank." Plaintiff asserts that his complaint was a problem for the organization, and Woods was being used as the conduit to press CID to reopen the investigation as a retaliatory measure.

The Court questions whether expressing disagreement with the conclusion of an investigation or urging that the investigation be continued is an adverse employment action even under the more lenient standard for retaliation claims. Plaintiff argues that the effort was to have Plaintiff titled, adversely affecting his security clearance. However, it is undisputed that the case was not re-opened, Plaintiff was not titled, and nothing else occurred. *See* Docket no. 42-4 (ROI Summary) ("Some conversations/questions could have occurred after the date the case was officially closed but those did not change the outcome of the case.").

Even if it is an adverse employment action, however, Defendant has proffered a legitimate, nondiscriminatory reason for these actions – the investigation was conducted quickly and did not determine the identity of the "mystery signature," which was one of the reasons the waiver packet had been referred to CID in the first place. Plaintiff fails to demonstrate that this asserted reason was pretextual.

Plaintiff's allegation is that "Norris emailed a copy of his CID sworn statement to Woods on April 23, after the CID agent closed the case and said she notified Waggoner, and a few days after Plaintiff filed his EEO action. Woods testified he had spoken to Waggoner about the CID sworn

---

summary judgment stage, and was given an opportunity to do so, but failed to submit all of the evidence that he references in his briefs.

statement; Woods noted he only spoke with Mr. Waggoner after he (Waggoner) filed his sworn statement. Lt. Col. Woods call[ed] the CID agent and her supervisor to press them to reopen the case, stating, I think we have a crime here, to which the CID supervisor said, no we do not or words to that effect." Plaintiff also states that "Lt. Col. Woods testified that Mr. Waggoner informed him he had filed a sworn statement with CID." Response at 38.

As noted, Plaintiff fails to demonstrate pretext insofar as he does not demonstrate that the reason given for disagreement with the conclusion – that the signature was not identified or that the investigation was cursory – is false. Further, Plaintiff demonstrates no reason for Woods, who was the Staff Judge Advocate, to retaliate against Plaintiff for filing an EEO Complaint against Norris, nor has he demonstrated that Woods was acting "as a conduit" for Norris, Waggoner, or anyone else. Woods was aware of the facts surrounding the CID investigation, and Plaintiff has not shown he was acting solely on information provided by Norris and/or Waggoner. Plaintiff has not demonstrated substantial evidence that Woods' actions (or anyone else who expressed disagreement with the investigation's conclusion or allegedly pressed to have the investigation reopened) would not have occurred 'but for' the protected activity. Accordingly, the Court grants summary judgment on Plaintiff's retaliation claims.

## C. Race Discrimination – denial of travel and training, and removal from COR

Plaintiff alleges that Defendant discriminated against him on the basis of his race by denying him travel to overseas duties, wrongfully removing him from duties as a Contracting Officer Representative ("COR"), and denying training opportunities.

### 1. timeliness

Defendant notes that a federal employee is required to initiate EEO counseling within 45 days

of the challenged employment action, and the failure to timely exhaust administrative remedies bars the claim.

Before seeking judicial relief for a Title VII violation, employees "must exhaust their administrative remedies by filing a charge of discrimination with the EEO division of their agency." *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). As part of the charge-filing process, an employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); *Teemac v. Henderson*, 298 F.3d 452 (5th Cir. 2002) (affirming district court's dismissal because employee failed to seek informal counseling within forty-five days of the alleged discrimination before filing EEOC complaint).

Defendant asserts that Plaintiff's claim regarding replacement as the COR is untimely since it occurred on or about April 7, 2005, yet Plaintiff did not make his first contact with an EEO Counselor to complain of discrimination until April 18, 2007. Defendant also argues that Plaintiff's denial of training claims are untimely, because they are based on events occurring between September 2004 and February 2006. Defendant argues that the denial of travel claims based on denials before March 4, 2007 are untimely.

Plaintiff responds that his claims were not treated as untimely in the proceedings before the Administrative Judge and EEOC. He asserts that the Administrative Judge accepted the EEO Officer's judgment that Plaintiff's claims of racial discrimination occurred over a number of years, and the combined effects and totality of the events let to his complaint. Response at 39. However, Defendant correctly points out that this will not waive the Defendant's defense of failure to timely exhaust administrative remedies as there is no affirmative finding of timeliness in the record.

In *Werner v. Department of Homeland Security*, 441 Fed. Appx. 246, 249 (5th Cir. 2011), the Fifth Circuit considered this issue, and held that the fact "[t]that the TSA investigated Werner's hostile work environment claim did not suspend the time limit [of 1614.105(a)(1)] nor indicate the government waived the defense of failure to timely exhaust administrative remedies." *Id.* Rather, "[i]n order to waive a timeliness objection, the agency must make a specific finding that the claimant's submission was timely," and in the absence of such a finding, summary judgment in favor of the defendant on timeliness was proper. *Id.*; *see also Ulanoff v. Henderson*, 240 F.3d 1073, at *4 (5th Cir. 2000).

The employee bears the burden of establishing waiver, estoppel, or equitable tolling to circumvent this EEO requirement. *Teemac v. Henderson*, 298 F.3d 452, 454, 457 (5th Cir.2002). The Fifth Circuit has held that equitable tolling should not be applied on the basis that timeliness was not raised as a defense at the administrative stage. *Rowe v. Sullivan*, 967 F.2d 186, 191 (5th Cir. 1992). The Fifth Circuit also "has refused to toll the requirement in 29 C.F.R. § 1614.105 . . . where the [employee] claimed he lacked the necessary knowledge to pursue his claims." *Eberle v. Gonzales*, 240 Fed. Appx. 622, 627 (5th Cir. 2007) (citing *Pacheco v. Rice*, 966 F.2d 904 (5th Cir. 1992) (the doctrine of equitable tolling "does not permit plaintiffs to suspend the time for filing discrimination complaints indefinitely when they discover instances of disparate treatment of other employees months or years after their discharge")).

Plaintiff points to no specific finding of timeliness in the record, and thus Defendant's timeliness defense warrants summary judgment as to all discrete acts of discrimination occurring more than 45 days before April 18, 2007. Because the COR removal was a discrete act of discrimination occurring in 2005, Plaintiff's claims related to this action are time-barred. To the

extent the travel and training allegations could be considered continuing violations, the doctrine requires a series of related acts of discrimination, at least one of which falls within the 45 day limitation period.  Plaintiff alleges that he was denied training from September 2004 to February 2006, and thus none of these events occurred within the 45-day period. Plaintiff alleges that he was denied travel between May 2005 and July 2007, and Defendant acknowledges that some of these claims may thus be timely.

### 2. removal of COR duties

Plaintiff complains that his duties as COR for a contract were removed in April 2005.  As noted, this claim is untimely and summary judgment on that basis alone is warranted.  However, Defendant also moves for summary judgment on other bases.

The contract at issue was for "mil group vehicle repair," and involved repair and maintenance of vehicles in connection with certain foreign embassies.  Docket no. 42-5 at 89-90.   The evidence shows that Plaintiff, a transportation specialist, was a COR, and Partab, a maintenance specialist was an alternate COR on the contract.  Docket no. 42-2 at 279.  As the transportation specialist, Plaintiff had written the statement of work and put together a lot of the contract.   The orders ran from September 14, 2004 to September 15, 2005.  Plaintiff complains that he was removed as COR on April 7, 2005.  Defendant asserts that the contract was a split contract between transportation and maintenance, and the decision was made to allow the maintenance specialist to focus on maintenance issues after the contract was in place so that Plaintiff could perform other duties in the office.[19]

Defendant seeks summary judgment on this claim on the basis that Plaintiff did not suffer a materially adverse employment action.  Defendant notes that this was a one-time contract that

---

[19] Witnesses testified to this effect at the fact-finding hearing.  Docket no. 42-5 at 89-93

expired five months later, such that the removal of a portion of Plaintiff's temporary duties as a COR was not materially adverse. The evidence shows that Plaintiff was not officially removed as COR, but did cease to perform the functions of a COR. Docket no. 42-5 at 181. Plaintiff has not provided summary judgment evidence that the removal of his COR duties was a materially adverse employment action. As the Court explained previously, a discrimination claim requires an adverse employment action. "[W]here the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action." *Anthony v. Donahoe*, 2012 WL 470193 (Feb. 13, 2012) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)). Removal of the temporary COR duties, with no other changes to Plaintiff's position, is not a materially adverse employment action.

Plaintiff further fails to show that similarly situated employees were treated more favorably under nearly identical circumstances. Although Partab was not removed as COR, he was a maintenance specialist, while Plaintiff was a transportation specialist. Thus he was not similarly situated. Summary judgment on this basis is also proper.

Defendant further argues that the duties were reassigned for a legitimate, non-discriminatory reason. Partab testified that the decision to transition COR duties to Partab was made by Col. Chavis. Docket no. 42-5 at 181 (Partab testimony). Norris testified at the fact-finding hearing that Chavis made the decision to remove Plaintiff's COR duties because he was needed to perform transportation duties. *Id.* at 91. At the EEOC hearing, he stated that the decision was made by himself and Col. Chavis. Docket no. 42-2 at 281.

Plaintiff contends he has established pretext insofar as Norris first testified that Plaintiff was

not removed from his COR duty and did not receive rescinded appointment orders, but then testified that Plaintiff's former second-level supervisor (Chavis) removed him from COR duty.  However, Norris testified at the fact-finding hearing both that Chavis made the decision to remove Plaintiff from COR duties, and that he was never officially taken off.  Docket no. 42-5 at 91-92.  Thus, these were not inconsistent statements.

Plaintiff complains that Norris discriminated against him by removing him as COR.  Docket no. 42-2 at 193-95.  Plaintiff further asserts that when an email was discovered that clearly indicated that Norris directed Plaintiff be removed, he again changed the story to say it was planned all along. Apparently, this was an email from Norris in which Norris stated to Chavis that Partab was the COR.[20]  As noted, the fact that Norris testified that Plaintiff was not removed as COR does not raise a fact issue on pretext.  There is evidence in the record that Plaintiff was not officially removed as COR, but he stopped performing the duties of COR.  Further, Norris explained the email by stating that COR and ACOR were interchangeable and that they were equal.  Docket no. 42-2 at 282.  Thus, this is not necessarily probative that Norris made the decision to remove Plaintiff as COR.  Further, other witnesses supported the Defendant's assertion that the plan to transition to Partab had been in place all along.  *See* Docket no. 42-6 at 14 (Major Rosas).  Thus, although Plaintiff has pointed out some discrepancies in the testimony concerning the removal of his COR duties, these are not material discrepancies such that Defendant's asserted explanation is not worthy of credence or pretextual.

Summary judgment on Plaintiff's race discrimination claims related to his COR duties is

---

[20]The Court notes that Plaintiff's response brief contains no citations to the record in support of any of these statements.

appropriate based on limitations, failure to establish a prima facie case, and failure to establish pretext.

3. denial of training

Plaintiff complains that he was denied several training courses from September 2004 to February 2006.[21]  As noted, because these events all occurred more than 45 days before Plaintiff went to the EEO Counselor, they are all barred by limitations.

Defendant further argues that training was denied for legitimate, nondiscriminatory reasons. Defendant asserts that when Plaintiff was denied attendance at particular courses it was because there was a lack of space or he needed to perform work in the office.  Norris testified that he denied some training requests, and did so for funding reasons and because he needed people to be there to do the work.  Docket no. 42-2 at 289, 313.  He also testified some training courses were approved but the courses were later cancelled.  Docket no. 4202 at 295.  Defendant notes that others, such as Plaintiff's first-level supervisor Lt. Col. Rosas, were denied training and TDY because they were needed in the office.

One course Plaintiff sought to take – the SBLM training – was a three-month long course away from the office and also had restricted enrollment numbers.  Docket no. 42-2 at 289-290, 316. Plaintiff compares himself to Mr. Partab, who was sent on the three-month long SBLM training, but no other employee was sent on any of the training courses Plaintiff says he was denied.  Further, Partab's circumstances were not similar because Partab's training was approved by Lt. Col. Chavis,

---

[21] Docket no. 42-6 (AJ Decision) at 4 ("From approximately September 2004 to February 2006, the Agency denied Claimant certain training, courses such as Logistics Executive Development course, Transportation and Logistics Management, Sustainment-Based Leadership and Management Course, and Transportation Coordinator training."); Docket no. 42-1 (EEOC Decision, listing same claim).

not Norris.  Norris testified that Partab "circumvented the system" to get his approval by going through Chavis and not Norris.  Docket no. 42-2 at 295.  Further, another Black employee (Pickett) was given training.  Docket no. 42-2 at 299.  Thus, Plaintiff fails to establish that any similarly situated employee was treated differently under nearly identical circumstances.

He further fails to demonstrate that the asserted legitimate, nondiscriminatory reasons given for denial of training were pretext or that race was a motivating factor in the denial of training.[22] Summary judgment is granted on these bases, in addition to limitations.

4. denial of travel

Plaintiff complains that between May 2005 and July 2007, he was denied travel because of racial discrimination.  Because Plaintiff contacted the EEO Counselor on April 18, 2007, some of this denial may have occurred within the limitations period.  However, because much of the underlying evidence has not been presented to the Court, the Court does not have a clear understanding of what travel was requested at what time, and what reasons were given for the denial of specific travel requests.

Plaintiff admits that he was sent on ten separate TDY trips for a total of 32 days.[23]  Thus, as found by the ALJ, there was no blanket restriction on Plaintiff's travel.  Plaintiff states in his response brief that his complaint is about the denial of overseas travel.  Response at 38. As noted,

---

[22] In his briefing, Plaintiff claims that no reason was given for not approving his application to attend the American University master degree program in logistics, an independent study course, done on the Plaintiff's own time and at no cost to the government.  However, the brief does not direct the Court to any evidence in the record concerning this course, and it is unclear whether this is one of the courses Plaintiff complained about in the administrative proceedings.  Further, he fails to demonstrate that any other similarly situated employees were not approved for this training.

[23] Docket no. 42-2 at 187.

however, the Court has not been directed to any specific evidence in the record before the Court concerning any specific overseas travel requests and the circumstances surrounding their denial.

In his administrative complaint, Plaintiff complained that he was not allowed to travel, but contractor employees were used to perform his duties. However, Defendant notes that Plaintiff acknowledges that one of these two contract employees is African-American. Plaintiff fails to show that similarly situated employees outside of his protected class were treated more favorably with regard to travel. Although he compared himself to Partab and Gomez at the EEO hearing, he fails to demonstrate that these employees were similarly situated to him or were treated more favorably under nearly identical circumstances.

Defendant argues that Plaintiff was not materially harmed by the denial of travel, and that travel was denied for legitimate nondiscriminatory reasons such as budget constraints. Some requested travel was not economically feasible. Docket no. 42-5 at 134. It was not unusual for travel requests to be denied due to funding. Docket no. 52-5 at 203. Further, the evidence shows that while travel could be required as part of Plaintiff's job, it was not a primary responsibility or necessary for performance of his job. Docket no. 42-5 at 134, 190-91. The Court finds that Plaintiff has failed to proffer sufficient summary judgment evidence to establish that he was materially harmed by the denial of travel or that the asserted reasons for the denial of travel were pretextual.

Accordingly, Plaintiff's race discrimination claims based on denial of travel are barred by limitations in part, and summary judgment is granted based on failure to establish a prima facie case and failure to establish pretext.

### D. Hostile Work Environment and Constructive Discharge

In his brief, Plaintiff contends that "[t]he Defendant created a hostile work environment,

29

perhaps to the level of constructive discharge."  Thus, to the extent Plaintiff asserts these claims, summary judgment is proper, as urged by Defendant in the motion for summary judgment.

Whether a work environment is hostile is determined by an objectively reasonable standard assessed by the totality of the circumstances.  *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 771 (5th Cir. 2009).  A hostile-work-environment claim must be supported by harassment "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment."  *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986).  Relevant factors include "frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Alaniz*, 591 F.3d at 771.  Plaintiff's evidence is insufficient to raise a fact issue concerning hostile work environment.

Constructive discharge claims are assessed by the objective standard of whether a "reasonable employee would feel compelled to resign" under the circumstances. *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008).  The evidence "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id.*  Plaintiff must show "working conditions . . . so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008).  Factors to look for include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

30

The evidence here does not rise to that level.  It cannot be said that Plaintiff's working conditions were so intolerable that a reasonable employee would feel compelled to resign. In fact, despite learning of the investigation in June 2007, Plaintiff did not resign until February 2008, when he left USARSO for a promotion to a GS-13 position with the Army Corps of Engineers.

**Conclusion**

Defendant's Motion for Summary Judgment (docket no. 41) is GRANTED.  Plaintiff shall take nothing on his claims, and the action shall be DISMISSED WITH PREJUDICE.  The Clerk shall close the case and enter Judgment in accordance with Rule 58.

It is so ORDERED.

SIGNED this 18th day of June, 2012.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE